## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRAD A. NICHOLS,     )
           )
     Plaintiff,   )  2:09-cv-0839
   v.       )
           )
MICHAEL J. ASTRUE, COMMISSIONER )
OF SOCIAL SECURITY,    )
           )
     Defendant.  )

### MEMORANDUM OPINION AND ORDER OF COURT

**NORA BARRY FISCHER, District Judge**

**I.**   **INTRODUCTION**

   Plaintiff Brad A. Nichols ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g) and §1383(c)(3) , seeking review of the final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act. The parties have filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. For the following reasons, the decision of the ALJ is supported by substantial evidence and Plaintiff's motion (Doc. No. 10) will be denied.

**II.**   **PROCEDURAL HISTORY**

   Plaintiff protectively filed his application for SSI on July 25, 2005, alleging disability since January 1, 1995 due to Crohn's disease, allergies, asthma, irritable bowel syndrome, hyperthyroidism, and depression. (R. 61, 64). Plaintiff's claim was denied at the initial level on December 15, 2005. (R. 36-40). He requested a hearing before an Administrative Law Judge ("ALJ") on February 12, 2006. (R. 41). A hearing was held on August 10, 2007. (R. 430-454).

Plaintiff, who was represented by counsel, appeared and testified at the hearing. *Id*. George

Starosta, a vocational expert, also testified. (R. 449-452). On November 5, 2007, the ALJ

issued a decision finding that Plaintiff was not disabled within the meaning of the Act. (R. 11-

28). The Appeals Council subsequently denied Plaintiff's request for review, thereby making

the ALJ's decision of the Commissioner in this case. (R. 4-6). Plaintiff now seeks review of

that decision by this court.

## III. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision

is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d

Cir. 1994).  The Court may not undertake a de novo review of the Commissioner's decision or

re-weigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.

1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of

Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42

U.S.C. §405(g). Substantial evidence "does not mean a large or considerable amount of

evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Pierce v. Underwood*, 487 U.S. 522, 565, 108 S.Ct. 2541, 101 L.Ed.2d

490 (1988). As long as the Commissioner's decision is supported by substantial evidence, it

cannot be set aside, even if this court "would have decided the factual inquiry

differently."*Haranft v. Apfel,* 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial

evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503

(3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents [her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health and Human Servs.,* 841 F.2d 57, 59 (3d Cir. 1988); 42 U.S.C. §423 (d)(1). A claimant is considered unable to engage in substantial gainful activity "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423 (d)(2)(A).

An ALJ must do more than simply state factual conclusions to support his ultimate findings. *Baerga v. Richardson,* 500 F.2d 309, 312-13 (3d Cir. 1974). The ALJ must make specific findings of fact. *Stewart v. Secretary of HEW*, 714 F.2d 287, 290 (3d Cir. 1983). Moreover, the ALJ must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rule making authority under 42 U.S.C. §405(a), has promulgated a five-step sequential evaluation process to determine whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520 (b), 416.920 (b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe

impairment," defined as "any impairment or combination of
impairments which significantly limits [the claimant's] physical
or mental ability to do basic work activities." [20 C.F.R.] §§
404.1520(c), 415.920(c). At step three, the agency determines
whether the impairment which enabled the claimant to survive
step two is on the list of impairments presumed severe enough to
render one disabled; if so, the claimant qualifies. [20 C.F.R.] §§
404.1520(d), 416.920(d).  If the claimant's impairment is not on
the list, the inquiry proceeds to step four, at which the SSA
assesses whether the claimant can do his previous work; unless he
shows that he cannot, he is determined not to be disabled.  If the
claimant survives the fourth stage, the fifth, and final, step
requires the SSA to consider so-called "vocational factors" (the
claimant's age, education, and past work experience), and to
determine whether the claimant is capable of performing other
jobs existing in significant numbers in the national economy. [20
C.F.R. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-5, 124 S.Ct. 176, 157 L.Ed. 2d 333 (2003)(footnotes

omitted.)

If the claimant is determined to be unable to resume previous employment, the

burden shifts to the Commissioner (Step 5) to prove that, given plaintiff's mental or physical

limitations, age, education, and work experience, he or she is able to perform substantial gainful

activity in jobs available in the national economy. *Campbell*, 461 U.S. at 461; *Stunkard*, 842

F.2d at 59; *Kangas*, 823 F.2d 775, 777 (3d Cir. 1987); *Doak v. Heckler*, 790 F.2d 26, 28 (3d

Cir. 1986).

## IV. FACTS

### A.    General Background

Plaintiff was born on September 8, 1984, making him twenty-three years of age at the

time of the ALJ's decision. (R. 20, 35). A twenty-three year old is considered a "younger

person" under 20 C.F.R. § 416.920(c). Plaintiff graduated from high school in a special

4

education program and is able to communicate in English. (R. 27, 433). Plaintiff had previously

been employed as a pantry helper for four months. (R. 434). Plaintiff avers January 1, 1995 as

the onset of his disability. (R. 61).

**B.    Medical Background**

Plaintiff claims to be disabled due to a number of gastrointestinal, respiratory,

thyroid, and mental impairments. Plaintiff's first relevant medical record was a sinus series

taken November 15, 2000 indicating frontal and maxillary sinusitis. (R. 307). Plaintiff

repeatedly underwent treatment for chronic sinusitis and asthma by his primary care physician,

Dr. Andrew Fackler of Renaissance Family Practice ("RFP"), from November 2000 to at least

March 2007. (R. 307, 399).[1] Symptoms of the ailments included chills, aches, congestion,

shortness of breath and intermittent fever. (R. 305).  As treatment for sinusitis, Dr. Fackler

generally prescribed antibiotics. (R. 420). Plaintiff also occasionally suffered from allergic

rhinitis due to multiple allergies. (R. 295, 296, 302-303, 410). On February 5, 2001, Dr.

Richard Green, an allergist, noted that Plaintiff suffered from perennial allergic rhinitis and

rhinosinusitis, stinging insect hypersensitivity, food allergy, and drug allergy. (R. 302).

Plaintiff received allergy shots for eleven years, but they were discontinued when they failed to

provide relief. (R. 277, 284).

Beginning in January 2001, Plaintiff treated with Dr. Ram Chandra and Dr. Anand

Ponnambalam, both pediatric gastroenterologists. (R. 208-209). Dr. Chandra reviewed

---

[1]

The treatment notes relevant to Plaintiff's sinusitis, asthma, and allergies appear in the
record at 217, 220, 241, 251, 255, 256, 259, 262, 269, 270, 278, 279, 285, 294, 291, 299, 301,
307, 399, 404, 410, 413, 420, 421, 422, 429.

Plaintiff's colonoscopy and EGD report from the previous October and noted that they were normal. (R. 208). Several food intolerances and allergies were noted. Plaintiff reported that he was having zero to one bowel movement a day that could be a little looser and occasionally had some constipation. He further reported some memory loss and intermittent headaches and lightheadedness. *Id*. His physical examination was normal and all systems were within normal limits. (R. 209). Dr. Chandra suggested that Plaintiff consult a neurologist for his memory loss. He also reported that Plaintiff's sinusitis was persisting and gave him medication and noted that the remainder of the problems were "mainly due to chronic irritable bowel, some anxiety, reflux, or possible lactose intolerance." *Id*.

At his next visit with Dr. Chandra, Plaintiff's blood work was reviewed and noted as within normal limits. (R. 206). His general physical examination was normal. Diagnoses were noted as chronic irritable bowel syndrome, depression and anxiety, gastroesophageal reflux, and inflammatory bowel disease. The inflammatory bowel syndrome was noted as a "very mild case." (R. 207). An upper GI/small bowel series was ordered. *Id*. Plaintiff was seen again in April 2001 with notations that he was "able to go to school and function normally." (R. 204). The previously ordered upper GI as well as a white blood cell scan were within normal limits. Plaintiff physical examination was normal. *Id*. Further blood work was ordered and he was continued on his medications. (R. 205).

On May 15, 2001, Plaintiff had an initial consultation with Dr. Benjamin Smolar, a neurologist, for what he reported as daily headaches and memory loss. (R. 95-95). Mental status testing was grossly unremarkable and a motor examination revealed no significant focal weakness. *Id*. An MRI of the brain and thoracic spine and an EEG were ordered, however,

6

because the neurological examination was not completely normal and indicated increased sensation in a possible T4-5 sensory level. (R. 95). Upon follow-up examination, Dr. Smolar noted that Plaintiff was stable neurologically with a normal MRI of the brain and thoracic spine and unremarkable EEG. Smolar suggested that Plaintiff's existing headache medication be tapered and replaced with something different. (R. 91).

On May 17, 2001, Plaintiff's primary care physician at the Renaissance Family Practice noted a new onset of hypothyroidism. (R. 294). A report was made by the primary care physician to Plaintiff's school in August 2001 indicating that Plaintiff's medical history included seizures and convulsions, allergies, mononucleosis, irritable bowel syndrome, history of Crohn's disease, hypothyroidism, and sinusitis. (R. 286-288). Several records indicated that Plaintiff was complaining of diarrhea starting in May 2001. (R. 281, 286-287, 296).  In September, his medications were listed as Pentasa (irritable bowel syndrome), Prilosec (acid reflux), Celexa (depression), Levsin (irritable bowel syndrome), Augmentin (sinusitis), Levoxyl (hypothyroidism), and Claritin (allergies). A urethral stent was placed in October 2001 due to a right mid-urethral stone (kidney stone), which was eventually passed and the stent removed. (R. 141,142, 279).

Plaintiff had a return visit with Dr. Chandra on June 18, 2001 at which time Plaintiff reported he continued to have some occasional diarrhea alternating with constipation. (R. 202-203). The physical examination was normal. Plaintiff's Levsin was increased to help with the diarrhea. *Id*. At his next visit on August 13, 2001, Dr. Chandra indicated Plaintiff's symptoms were under good control with normal bowel movements and no heartburn, chest pain, back pain, fever, chills, or other symptoms. (R. 200). In September 2001, Plaintiff reported two

weeks of abdominal pain and diarrhea, reporting six to eight loose bowel movements per day. His general physical exam was normal. He was instructed to stop taking his Augmentin (for the treatment of his sinusitis) to alleviate loose stool symptoms. (R. 198). A stool culture and blood work was ordered. *Id*.

On October 12, 2001, Dr. Chandra had a phone conversation with Plaintiff's mother who indicated Plaintiff's repeated absences from school. (R. 196). The mother reported that an evaluation had been done at Children's Hospital where a RAST test was negative. According to the mother the hospital diagnosed Plaintiff with having lactose intolerance and potentially Crohn's disease. Dr. Chandra reiterated that he felt Plaintiff predominately had irritable bowel syndrome with hypothyroidism, mild inflammatory bowel disease, and aggravation of symptoms with sinus infections. *Id*. An endoscopic evaluation and colonoscopy were ordered. (R. 197). Plaintiff's mother informed Dr. Chandra that she was having problems with Plaintiff's school believing that a phobia of school was causing Plaintiff's problems. Dr. Chandra suggested a psychiatric evaluation with an adolescent psychiatrist. *Id*. Plaintiff was seen by Dr. Chandra on October 29, 2001 for continuing complaints of "some gastrointestinal symptoms." (R. 194-195). Dr. Chandra noted that Plaintiff reported seeing three separate psychologists in the past and taking trials of several different medications that seemed to increase his anxiety. The ordered endoscopy revealed "evidence of reflux esophagitis and gastritis." Biopsies were normal, disaccharidase analysis revealed normal enzyme activity, and the colonoscopy (which could not be completed due to poor preparation) showed "some mild microscopic colitis." Plaintiff's physical examination was normal and he was advised to try returning to school. (R. 195).

8

Plaintiff was placed back in a special education program in November 2001 due to significant absences from school (96 days total) and failing grades in his academic classes. (R. 101). He was initially referred by his parents due to chronic absenteeism from illness having missed a significant amount of school from 4th grade on with periods of homebound instruction. (R. 113-114). Plaintiff's mother noted that he sometimes had thoughts of harming himself and others, but testing indicated that there was "not a great deal to be concerned about with Brad's emotional adjustment other than in the area of somatization." (R. 115, 120). The school administrators concluded that Plaintiff's Crohn's disease had impaired his functioning to a significant degree. (R. 122-123).

On November 20, 2001, Dr. Elias Hilal, an otolaryngologist, saw Plaintiff for complaints of chronic nasal congestion and rhinorrea with frequent blockage and headaches. (R. 277). Upon examination, Dr. Hilal noted a nasal septal deviation to the right with diffusely hyperemic nasal mucosa and mild erythema in the arytenoids. Examination of the mouth and pharynx was normal, an indirect laryngoscopy was normal, and an examination of the ears and neck was normal. *Id.* A CT scan of the sinuses was essentially clear. (R. 140). Upon follow-up examination, Dr. Hilal noted that Plaintiff's mucosa was slightly hyperemic with mild septal deviations to both sides. (R. 272). Examination of the mouth, pharynx, and nose was normal and no excessive drainage was noted. *Id.*

Plaintiff returned to see Dr. Chandra on February 8, 2002 at which time Plaintiff's mother reported he was doing worse with increasing migraines and extreme difficulty in school with abdominal pain and alternating episodes of diarrhea and constipation. (R. 192). Plaintiff's general physical examination was normal with some tenderness in the colonic distribution.

Plaintiff had discontinued the psychotropic drugs that were previously prescribed by Dr.

Chandra. (R. 193).

From April 2, 2002 to April 15, 2002, Plaintiff was involuntarily committed at St.

Francis Medical Center due to hitting his father and stating that he wanted to kill himself. (R.

126). The discharge summary indicated Plaintiff's admission of using alcohol and marijuana

and using increasing verbal aggression towards his father. *Id*. Dr. Prabir Mullik noted a

depressed mood, intense affect, agitation, normal speech, poor insight and judgment, and intact

memory. (R. 127). Plaintiff was diagnosed with depression, NOS and rule out bipolar disorder

with marijuana dependence and assessed with a GAF of 50.[2] (R. 128). He was provided a trial

of Risperadal. *Id*. On July 12, 2002, Dr. J. Octavio Salazar, a psychologist, diagnosed Plaintiff

with bipolar mixed severe and placed him on Trileptal, Risperdal, and Zoloft. (R. 261).

Plaintiff was again examined by Dr. Chandra on August 22, 2002. (R. 190-191).

Plaintiff indicated a resolution of symptoms. Plaintiff's physical examination was normal and

---

[2]

      The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF score of between 31-40 denotes severe impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;  of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ."  Id.

he was continued on his medications. (R. 190). For the remainder of 2002, 2003, and 2004, the record indicates treatment for sinusitis and intermittent ear infection and a continuation of medications by RFC for those diagnoses. (R. 241, 251, 254, 255, 256, 259, 262).

On November 18, 2002, Plaintiff had a return visit with Dr. Chandra and indicated a continuing absence of symptoms. (R. 188). Plaintiff's general physical examination was normal and he was advised to continue on his current medications. (R. 189). It was noted that Plaintiff was taking Zoloft. At a return visit in February 2003, Plaintiff reported a "little increase" in his bowel movements. (R. 186). Dr. Chandra noted that Plaintiff had stopped his Zoloft of his own accord two weeks prior for fear that it was treatment for depression, but was otherwise having few symptoms and was functioning in school. His examination was normal and it was explained to Plaintiff that the Zoloft was being used to treat his irritable bowel syndrome and that it needed to be restarted. (R. 186-187).

Plaintiff's next visit with Dr. Chandra occurred on July 21, 2003. (R. 184-185). Plaintiff reported that his gastrointestinal symptoms were under fairly good control and his sleep was appropriate. (R. 184). His recurrent sinus infections were noted as being poorly controlled.  Plaintiff's physical examination was normal and he was continued on his medications. He was also placed on antibiotics for a three week treatment secondary to sinus symptoms. (R. 185). Plaintiff's next appointment on December 1, 2003 produced similar results with Plaintiff reporting doing well and a normal physical examination. (R. 182). At his visit on April 30, 2004, Plaintiff reported doing fairly well with no symptoms but was suffering from a sinus infection. (R. 180). His physical examination was normal and he was continued on his medications with the addition of a course of antibiotics to treat his sinusitis. (R. 180-181).

In September 2004, Plaintiff had another normal examination by Dr. Chandra and reported his symptoms were under fairly good control. His medications were continued and blood work was ordered. (R. 178-179). Plaintiff's next visit occurred on January 21, 2005. (R. 176-177). His blood work was noted as within normal limits and his physical examination as normal. *Id*. Plaintiff reported worsening GI symptoms of heartburn, chest pain, and dysphagia (sore throat) that he attributed to a course of antibiotics for pneumonia. An endoscopy as well as blood work was ordered. (R. 177). On January 27, 2005, an endoscopy and biopsies were performed on Plaintiff with a post-operative diagnosis of exacerbation of reflux erosive esophagitis producing symptoms of dysphagia, antral gastritis and bacterial overgrowth syndrome. (R. 133-134). Dr. Chandra noted that there was no noted stricture or upper GI bleeding. (R. 174).

At his examination on February 17, 2005, Plaintiff reported symptoms of sharp, stabbing abdominal pain, throat constriction, thin bowel movements, poor appetite, weakness, fatigue, and chronic congestion and sinus drainage. (R. 174-175). Dr. Chandra ordered an ultrasound and barium swallow, placed Plaintiff on Claritin, and set up an appointment for Plaintiff with an ear, nose, and throat specialist as Dr. Chandra noted that Plaintiff's symptoms were likely related to his sinus problems. (R. 175). A follow-up abdominal ultrasound on February 15, 2005 was unremarkable with no evidence of gastroesophageal reflux. (R. 131-132). At a February 28, 2005 follow-up, Plaintiff reported that he was continuing to alternate between diarrhea and constipation with no GI bleeding as well as trouble sleeping and intermittent fever. (R. 172-173). Plaintiff's physical examination was normal and Dr. Chandra diagnosed exacerbation of gastroesophageal reflux disease secondary to post viral enteropathy

12

and suspected anxiety/panic disorder. Dr. Chandra opined that his symptoms were related to anxiety disorder, but ordered an EKG as well as an x-ray to rule out a cardiac condition. Plaintiff's Zoloft was increased. (R. 173).

Plaintiff was examined by Dr. Chandra again on July 27, 2005 at which time Plaintiff reported continuing reflux and regurgitation with heartburn, chest pain, and sore throat. (R. 170). Plaintiff noted that his symptoms got "better off and on but [were] getting worse over last month. *Id*. Dr. Chandra reported that bowel movements were occurring mainly one time a day. *Id*. Plaintiff's physical examination was normal. Dr. Chandra increased Plaintiff's Zantac and Zoloft. (R. 171). Plaintiff was seen by Dr. Fackner for knee pain secondary to a motorcycle accident on August 8, 2005. It was noted as merely a contusion. (R. 215). On August 23, 2005, Plaintiff was seen by his family practitioner for complaints of excessive fatigue. (R. 210). Plaintiff was concerned that it was due to HIV or Hepatitis C from a needle stick, but blood work was negative for both. (R. 210-214).  In August 2005, Plaintiff medications were noted as Pentasa (irritable bowel syndrome), Prilosec (acid reflux), Amitriptyline (antidepressant), Zoloft (depression), Rantidine (heartburn and indigestion), Singulair (asthma), Nasonex (allergies), Albuterol (asthma), Advair (asthma), Levothroid (hypothyroidism), and Glycolax (constipation). (R. 77).

The state agency psychological consultant, Dr. Anthony Goreczny, performed a consultative examination and residual functional capacity evaluation on October 18, 2005. Plaintiff reported a history of feeling depressed, sleeping through the night most nights, a variable appetite, and physical problems including food and environmental allergies, sinusitis, chronic fever, allergy-induced asthma, Crohn's disease, and hypothyroidism. (R. 315-316). He

further indicated some problems with the law including two short stays in a juvenile facility. *Id*. Upon examination, Plaintiff was alert and oriented, had normal speech, lacked detail in his thought content and was somatically focused, had a dysphoric mood marked mostly with depression and some mild anxiety with restricted affect, had intact memory, and moderately impaired attention and concentration. (R. 316). On his Cognitive Capacity Screening Examination, Plaintiff scored a 22 out of 30, which was noted as low. *Id*. Dr. Goreczny diagnosed Plaintiff with major depressive disorder, moderate chronic with a GAF of 60. *Id*. Plaintiff's functional capacity was assessed as mild limitations in carrying out simple instructions and in interacting with the public; moderate limitations understanding and remembering detailed instructions, carrying out detailed instructions, and making judgments on simple work-related decisions; and marked restrictions in interacting appropriately with supervisors, interacting with co-workers, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a work setting. (R. 317-318).

A separate physical capacity evaluation was performed by Dr. Alfred Mancini on November 30, 2005. (R. 320-323). Dr. Mancini opined Plaintiff could occasionally lift fifty pounds, frequently lift twenty-five pounds, stand/walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, was unlimited in his ability to push and pull, and had environmental limitations of needing to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to his asthma. *Id*.

On December 12, 2005, Dr. Roger Glover, a second state agency psychologist, completed a psychiatric review technique and mental residual functional capacity form after reviewing Plaintiff's records. (R. 330-340). Dr. Glover opined that Plaintiff did not meet the

requirements of a listing, but had an affective disorder with disturbance of mood accompanied by a full or partial depressive syndrome with psychomotor agitation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 330). In final assessment, Dr. Glover noted mild restrictions in Plaintiff's activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace and no episodes of decompensation. (R. 337). Plaintiff's residual functional capacity included moderate limitations in his ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance, be punctual within normal tolerances, complete a normal workweek and workday without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number or length of rest periods, ability to interact appropriately with the public, ability to maintain socially appropriate behavior and to adhere to the basic standards of neatness and cleanliness, ability to respond appropriately to changes in the usual work setting, ability to set realistic goals, and ability to make plans independently of others. (R. 340).

Dr. Chandra examined Plaintiff on January 26, 2006 for complaints of heartburn a couple of times a week and vomiting once a month. (R. 428). Dr. Chandra noted Plaintiff's previous diagnoses of nonspecific colitis since 2000, irritable bowel syndrome, lactose intolerance, gastroesophogeal reflux disease, psychophysiological gastrointestinal disorder, constipation, and past history of dysphagia with concomitant diagnoses of hypothyroidism, recurrent sinusitis, allergic rhinitis, renal calculi, anxiety disorder, palpitations, food allergy, and asthma. *Id*. Plaintiff's physical examination was normal with some diffuse tenderness over

the lower part of the abdomen. Dr. Chandra indicated an exacerbation of reflux symptoms

requiring a change of medication from Prilosec to Nexium. Plaintiff was advised to follow a

strict diet and told to seek help for his depression. *Id*.

On February 2, 2006, Dr. Fackler completed a medical statement regarding his claim

of disability. (R. 423-426). Dr. Fackler indicated symptoms of shortness of breath, abdominal

pain, diarrhea, depression, muscle aches, and fatigue with a pertinent medical history of asthma,

colitis/Crohn's disease, and depression. He noted that the symptoms were persistent and that

medication was being used as treatment for all of Plaintiff's ailments. Dr. Fackler opined that

Plaintiff was incapable of working and could lift fifty pounds occasionally but never one

hundred pounds; stand/walk for less than two hours because of bad aches, fatigue, and

shortness of breadth; alternate sitting and standing at no more than a one hour interval; was

unlimited in his ability to push or pull; should never climb or balance; and could occasionally

stoop, kneel, crouch, and crawl. Dr. Fackler further opined that Plaintiff suffered from severe

muscle and abdomen pain at times and had environmental limitations with respect to

temperature extremes, dust, fumes, odors, gases, and humidity. Dr. Fackler opined that Plaintiff

had marked restrictions in the activities of daily living, marked difficulty in maintaining social

functioning and deficiencies in concentration, persistence, and pace resulting in frequent failure

to complete tasks in a timely manner due to pain. *Id*.

On February 1, 2006, Plaintiff began treating with Dr. Joseph Altman, a licensed

psychiatrist, two to three times per month for depression.[3]  Generally, Plaintiff reported

---

[3]

Dr. Altman's records from February 2006 to July 2007 appear at pages 350-395 of the

(continued...)

depression symptoms and anger management problems. He expressed recurrent anger towards his parents, his inability to leave his house, his lack of transportation, his lack of friends, and his physical problems and indicated that he would pound doors and throw and kick things. He experienced significant difficulties with his parents at home.  Plaintiff reported depression symptoms of difficulty concentrating, frustration, helplessness, isolation, and difficulty sleeping.  He reported a lessening of these symptoms several times during treatment. (R. 369, 373, 375, 381, 382, 385, 387). Plaintiff discussed taking a course in repairing motorcycles and bought two used motorcycles on the internet, which he eventually fixed (with the aid of a friend) and sold so that he could buy a car.  He expressed a significant interest in collecting guns and either taking a course in gun-smithing or getting an apprenticeship, which was encouraged by Dr. Altman. Plaintiff was treated with Zoloft but reported that it was not effective.

Dr. Altman completed a medical report regarding Plaintiff's claim for benefits on March 28, 2006. (R. 388-389). Plaintiff's symptoms were reported as sleep deprivation, no energy, loss of interest, feelings of hopelessness and helplessness, difficulty concentrating, and anxiety. Altman diagnosed mood disorder with depressive features due to Crohn's disease, asthma, and irritable bowel syndrome. Dr. Altman opined that Plaintiff was incapable of working with marked restrictions in the activities of daily living, marked difficulty in maintaining social functioning, and deficiencies in concentration, persistence, and pace resulting in the frequent failure to complete tasks in a timely manner. (R. 389).

---

[3](...continued)
record. Each session was significantly similar with Plaintiff discussing his anger with his parents, motorcycles, and guns and gun-smithing.

17

On June 17, 2006, Plaintiff was examined by Dr. Chandra for complaints of multiple episodes of regurgitation, reflux on and off with heartburn, and bloating and fullness. (R. 414-415). Plaintiff's physical examination was normal and his blood tests were normal except for positive ASCA IgA and IgG. Medication was added to Plaintiff's treatment. *Id*. At a follow-up on July 17, 2006, Dr. Chandra indicated that Plaintiff's physical examination was normal and that he was currently stable. (R. 411-412). At a final examination, Dr. Chandra noted that Plaintiff's general physical examination was normal and continued him on current medications. (R. 396). He referred Plaintiff to a new gastroenterologist to follow Plaintiff further. *Id.*

In July of 2007, Dr. Altman composed a letter stating that Plaintiff was in his care since February 2006 and suffered from depressive symptoms and anger management problems. Dr. Altman opined that Plaintiff was currently unable to work due to a number of physical problems and was living at home with his parents. (R. 348). A diagnosis of major depressive disorder treated with Zoloft was noted. Dr. Altman reported a long history of dysfunction at home between he and his parents and problems with social isolation, anger management, his family, and his health as reasons that prevented Plaintiff from maintaining a full time job, living independently, and functioning normally. *Id.*

C.    **Administrative Hearing**

At the hearing, Plaintiff appeared with the assistance of counsel, William Remaley, Esq. (R. 430). Plaintiff testified that he completed high school in a special education program and took some motorcycle repair technician course work. (R. 434). He testified that he had worked for a short time as a pantry helper at the same restaurant as his father. *Id.*  He left the job due to problems with intermittent bowel movements and diarrhea that would require him to

18

leave his position and use the bathroom about four times a day. (R. 435, 438). Plaintiff indicated that similar issues had caused him to be placed in the special education classes and miss a significant amount of school because he had to leave class often to use the bathroom and suffered from other physical problems. (R. 447). Plaintiff testified that his Crohn's disease and irritable bowel syndrome were unpredictable, causing bad cramping and horrible aches that could be severe at times . (R. 444). He also testified that while he had originally suffered from diarrhea, the medication Pentasa now caused constipation that required him to use laxatives to attempt to move his bowels. *Id*. Plaintiff indicated that his depression caused him to have no motivation, difficulty sleeping, express anger and irritability towards other people, and isolate himself. (R. 445-447). He explained a typical day as getting up, eating, taking medication, laying around, watching TV, and sometimes using the computer. (R. 445). He further testified that in February 2004 he was walking two miles a day and playing football and had ridden his motorcycle off-road about a dozen times since his filing date in 2005. (R. 441).

Following Plaintiff's testimony, the ALJ heard testimony from a vocational expert, George Starosta. (R. 450). The ALJ posed a hypothetical question to the vocational expert and asked what work such a person could perform. (R. 450). The ALJ described a person who could do no more light exertional activity and is precluded from exposure to hazards such as unprotected heights and heavy machinery, is limited in terms of environmental factors to environments with no temperature extremes, no excessive humidity, no chemical fumes, and no airborne particulates. *Id*. He defined temperature extremes as less than forty degrees Fahrenheit or greater than ninety degrees Fahrenheit on a continuous basis. Finally he stated that the individual would be accorded a discretionary sit/stand option and relegated to simple routine

19

tasks involving no more than occasional change in work processes and no piecework productionary pace. *Id*. The vocational expert testified that the hypothetical person could do the job of a labeled gate guard, station self-serve attendant, and ticket-taker. (R. 451). The vocational expert further testified that these jobs exist in significant numbers in the national economy. *Id.* The vocational expert also testified that if the hypothetical individual needed to take rest breaks five times per day, there would be no work available for the hypothetical individual. (R. 452)

## V.  DISCUSSION

The ALJ concluded that the Plaintiff was not disabled as defined by the Social Security Act. The ALJ reached this decision after applying the five step framework for analysis summarized in *Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003).

### A.    The Five Step Analysis

Under the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 25, 2005, the application date. (R. 13). At step two, the ALJ determined that Plaintiff suffered from severe impairments under the standards set forth in 20 C.F.R. §§ 416.920 (c).  (R. 13-14). Specifically, the ALJ determined that Plaintiff suffered from Crohn's disease/non-specific colitis, concomitant irritable bowel syndrome, lactose intolerance, chronic gastroesophageal reflux disease, hypothyroidism, recurrent sinusitis, allergic rhinitis, food allergies, asthma, depression, and anxiety. *Id.* In the third step, the ALJ determined that none of Plaintiff's medical impairments met or equaled any impairment listed in 20 C.F.R. Pt. Subpt. P, App. 1 (the "Listing of Impairments"). *Id.*

Next, the ALJ determined that the Plaintiff's current residual functional capacity did not allow him to return to his past relevant work. (R. 27). Accordingly, at step four the ALJ made the following residual capacity assessment:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform no more than light work activity and is precluded from hazards such as unprotected heights and dangerous machinery and is limited in terms of environmental factors to an environment with no exposure to temperature extremes, no excessive humidity, no chemical fumes and no airborne particulates. Temperature extremes are defined as no less than 40 degrees or greater than 90 degrees Fahrenheit on a continuous basis. In addition, he is accorded a discretionary sit/stand option and is relegated to simple, routine repetitive tasks involving only occasional changes in work processes and no piecework production pace.

 (R. 20). The ALJ further found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Plaintiff's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible. (R. 21-22).

Finally, under step five, the ALJ determined that there were jobs existing in significant numbers in the national economy that Plaintiff could have performed. (R. 27). The ALJ relied on the testimony of the vocational expert who testified that an individual with Plaintiff's limitations would be able to perform the requirements of the representative occupations of labeled gate guard, station self-serve attendant, and ticket-taker. (R. 27-28). He further determined that pursuant to SSR 00-4p, the vocational expert's testimony was consistent with the Dictionary of Occupational Titles. *Id.* Accordingly, the ALJ found that a finding of "not disabled" was appropriate under the Social Security Act. (R. 28).

21

### B.      Issue Before This Court

Accordingly, Plaintiff makes several arguments suggesting that the ALJ erred in his

reasoning. First, Plaintiff argues that the ALJ failed to give the proper weight to the opinions of

Dr. Fackler and Dr. Altman. (Pl.'s Brief at 7). He also suggests that the ALJ improperly

evaluated Plaintiff's subjective complaints of pain and discredited those complaints. *Id.* at 12.

Due to the limited weight given the physicians' reports and Plaintiff's subjective complaints,

Plaintiff argues that the ALJ improperly determined the Plaintiff's residual functional capacity

and relied on an incomplete hypothetical question. *Id.* at 9-12. The Plaintiff further argues that

the ALJ erred in determining that Plaintiff did not meet Listing 12.04.  To the contrary, the

Defendant argues that the ALJ's determination was supported by substantial evidence. (Def.'s

Brief at 9).

### C.      Weight Given to Treating Physician Reports

As to the first issue, Plaintiff argues that the ALJ failed to properly consider the

opinions of Dr. Altman and Dr. Fackler, both treating physicians. (Pl's Brief at 7). Plaintiff

states that the ALJ should have given the February and March 2006 reports that Plaintiff was

incapable of working greater weight because they were generally consistent with the medical

evidence as a whole. Plaintiff further argues that the opinion of Dr. Anthony Goreczny should

have been given substantial weight because it was "clearly supported by the other evidence of

record." (Pl's Brief at 9).

"A cardinal principle guiding disability eligibility determinations is that the ALJ

accord treating physicians' reports great weight, especially 'when their opinions reflect expert

judgment based on a continuing observation of the patient's condition over a prolonged period

22

of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186

F.3d 422, 429 (3d Cir. 1999)); *see also Allen v. Bowen*, 881 F.2d 37, 41 (3d Cir. 1989);

*Podedworney v. Harris*, 745 F.2d 210, 217-18 (3d Cir. 1984).  For example, where the

consulting/examining physician's report constitutes the only probative medical evidence on the

condition in question, it may be entitled to great or even controlling weight. *See Reid v. Chater*,

71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight

where it was only medical assessment on point and corroborated by other evidence). Similarly,

examining physician's reports that rest on objective clinical test results may be entitled to

significant or controlling weight. *See Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

A treating physician's medical opinion is not entitled to controlling weight where it is not "well-

supported by medically acceptable clinical and laboratory diagnostic techniques" or is

"inconsistent with the other substantial evidence in [the] case record." 20 C.F.R.

404.1527(d)(2).

In the ALJ's opinion, he considered the findings associated with Dr. Fackler's reports

and addressed them as follows:

> As previously discussed, his primary care physician Dr.
> Fackler has opined on several occasions that the claimant's
> physical conditions including his pain and shortness of breath
> precludes him from working. Even though Dr. Fackler is a
> treating physician, his opinion cannot be accorded full weight as
> the medical evidence does not substantiate the severity of the
> alleged body pain, fatigue, and shortness of breath. (20 CFR
> 416.927 and SSR 926-2p). His clinical findings do not support
> the findings of disability. Moreover, his assessment as to the
> severity of the fatigue is not consistent with the reports from Dr.
> Chandra's office, which documented minor complaints of fatigue
> in January 2006 and again in June 2007. (Exhibits 6F and 14F).
> Moreover, Dr. Chandra's physical examinations findings [*sic*]
> were reported as being within normal limits despite his subjective

23

> complaints. Furthermore, neither Dr. Chandra nor Dr.
> Ponnambalam has opined that the claimant's multiple physical
> conditions preclude him from working.... Additionally, the
> undersigned is not bound by any of the medical opinions
> expressed, as the ultimate issue of disability is an issue reserved
> to the undersigned as delegate of the Commissioner (SSR 96-5p).

(R. 26). The ALJ highlighted that the Plaintiff's visits to the Renaissance Family Practice (Dr.

Fackler and associates) were mainly for his chronic sinusitis or recurrent sinus infections. (R.

22). A CT of the sinuses in 2001 was essentially normal and he was recurrently treated with

antibiotics for the sinusitis. Flare-ups of Plaintiff's asthma were noted only intermittently in the

record with indications of shortness of breath and were treated with inhalers. (R. 210, 410, 417,

420). The other symptoms relating to Crohn's, irritable bowel, and acid reflux were primarily

treated by Dr. Chandra.

Dr. Chandra's records show that Plaintiff's symptoms were under fairly good control

from January 2001 to January 2005. Plaintiff had a normal colonoscopy, EGD[4], blood work,

upper GI, white blood cell scan, biopsies, and disaccharidase analysis. (R. 195, 204, 206, 208).

A later endoscopy indicated "evidence of reflux esophagitis and gastritis" and colonoscopy

indicated only "some mild microscopic colitis." (R. 194-195). Plaintiff's conditions of irritable

bowel syndrome, nonspecific colitis, and gastroesophageal reflux disease were controlled with

medications. His physical examinations were all normal. Normal physical examinations were

noted even after the exacerbation of his reflux disease in January 2005. He also had a normal

---

[4]

An esophagogastroduodenoscopy or "EGD" is an examination of the lining of the
esophagus, stomach, and upper duodenum with a small camera. National Institutes of Health/
U.S. National Library of Medicine, *Esophagogastroduodenoscopy*, *available at*
http://www.nlm.nih.gov/medlineplus/ency/article/003888.htm (last visited January 19, 2010).

ultrasound in February 2005. (R. 131-132). Plaintiff made only minor complaints of fatigue to

Dr. Chandra through the following visits up to March 2007. A review of the record as a whole

reveals that the ALJ did point to sufficient evidence to contradict Dr. Fackner's opinions.

Therefore, it was not in error for the ALJ to give Dr. Fackner's report little weight.

    As noted above, Plaintiff also argues that Dr. Altman's letter and report were entitled

to substantial weight.[5] In his decision, the ALJ similarly gave Dr. Altman's opinions little

weight in his rationale as follows:

> No weight can be accorded to the checkbox conclusory form
> that was based solely on the claimant's subjective allegations
> given the short duration of the relationship. Moreover, the initial
> sessions focused on his physical complaints, uncorroborated by
> medical records. Moreover, the claimant reported having less
> depression when he employed EFT treatment, 5-6 times a day. He
> also stated that the Zoloft did not do much for him but that he
> was afraid of change because of drug interactions. The therapy
> note of April 2006 indicated that he had bought two motorcycles
> off eBay and planned to fix up and sell them or sell the parts to
> make money. He also reported getting his drivers license but that
> his parent's [sic] would not let him drive the car for insurance
> reasons. In May 2005, he reported finishing the motor cycle
> repair program and obtaining his certificate but that he was not
> longer interested in this line of work because of his health (the
> fumes aggravate his asthma). In fact, Dr. Altman noted a pattern
> of complaints about various situations but that the claimant does
> not look for solutions (Entry of August 2006). There were
> multiple discussions about getting bike fixed and then selling it
> for a car to obtain more freedom. In November 2006, his parents
> loaned him the money to buy the newer version of play station
> (Exhibit 13F/24). In January 2007, he reported spending much of
> his time watching TV, using the computer, and working on his
> gun collection (Exhibit 13F/17). After an adjustment in his
> medications, the entry of July 2007 noted that he was doing more.
> Also that he was buying and selling items on the internet to make
> some money (Exhibit 13/F). The entries in June/July 2007

_____

[5] The letter and report indicate the same findings.

25

> primarily note no symptoms of depression only anger and
> irritability. In May 2007, a friend helped him fix-up two bikes to
> sell on eBay for $2000. He was also doing some gunsmith work
> on rifles.

(R. 18). The ALJ went on to cite to Plaintiff's off-road motorcycle riding and motorcycle

accident as evidence of his ability to function. (R. 26). Mention was also made of Plaintiff's

marijuana use contributing to his psychiatric hospitalization in 2002. *Id.*

Plaintiff did not begin treatment with Dr. Altman until February 2006. (R. 394-395).

Plaintiff was involuntarily committed in April 2002, but after that hospitalization had only one

visit with a psychologist in July 2002. (R. 261).  Before and following his hospitalization he

had only occasional treatment with amitriptyline[6] or Zoloft[7] through Dr. Chandra or Dr. Fackner

and no other significant psychological treatment. Plaintiff took himself off of his psychotropic

medications on occasion without the advice of a doctor for concerns that they were trying to

"treat depression." (R. 186-187, 193).  Once he began treating with Dr. Altman, Plaintiff

consistently talked about wanting to fix up motorcycles for money, going so far as to buy two

motorcycles, fix them with a friend, and sell them on eBay. He also discussed an interest, at

nearly every session, of collecting, working on, and potentially having a career with guns and

---

[6]

Amitriptyline is a tricyclic antidepressant used to treat symptoms of depression. National Institutes of Health/ U.S. National Library of Medicine, *Amitriptyline*, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (last visited January 19, 2010).

[7]

Zoloft, or sertraline, is used to treat depression obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. National Institutes of Health/ U.S. National Library of Medicine, *Sertaline*, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a697048.html (last visited January 19, 2010).

gun-smithing. On several occasions throughout treatment Plaintiff reported a lessening of his depression symptoms and consistently his complaints related more to anger-management issues. (R. 369, 373, 375, 381, 382, 385, 387). Plaintiff also discussed borrowing money from his parents to buy a Play Station and admitted to riding motorcycles off-road on about twelve occasions after his filing date with a motorcycle accident occurring in 2005. (R.  215, 441). The record indicates that Plaintiff was capable of performing a number of activities and had a corresponding alleviation of his symptoms while performing those activities. (R. 358, 364, 371, 379, 381, 383, 385, 441). As a result, the ALJ did not err in giving little weight to Dr. Altman's form and letter.

Finally, Plaintiff suggests that Dr. Goreczny, a consulting physician, was entitled to substantial weight when he opined that Plaintiff had marked restrictions in the ability to interact appropriately with supervisors, interact with co-workers, respond appropriately to work pressures in a usual work setting and respond appropriately to changes in a work setting. (R. 317-318). The ALJ rejected Dr. Goreczny's opinions based on Dr. Goreczny's own findings that Plaintiff suffered from "moderate" major depressive disorder with a GAF of 60, which is indicative of moderate symptoms. (R. 15). He also relied on the findings of the second state agency psychologist that Plaintiff suffered from only mild to moderate limitations of functioning. (R. 15-16). It was also noted that Plaintiff testified that his problems at work were related to the frequent need to use the bathroom; not issues with co-workers, supervisors, or the pressures or changes of the work itself. (R. 16). These findings were all supported in the record, and as Dr. Goreczny was not a treating physician and not entitled to the treating physician presumption, the ALJ did not err in his treatment of Dr. Goreczny's opinion. As a result, the

ALJ's determinations with respect to the opinions of Dr. Altman, Dr. Fackner, and Dr. Goreczny's opinions were supported by substantial evidence.

### D.    Plaintiff's Credibility

Plaintiff argues that the ALJ erred in improperly evaluating and discrediting his complaints of "abdominal pain and other pain in his body." (Pl.'s Brief at 12). An ALJ must give serious consideration to the claimant's subjective complaints, even when those assertions are not fully confirmed by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993); *Welch v. Heckler,* 808 F.2d 264, 270 (3d Cir.1986).   Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. *E.g., Carter v. Railroad Retirement Board,* 834 F.2d 62, 65, *relying on Green v. Schweiker*, 749 F.2d 1066, 1068 (3d Cir. 1984); *Smith v. Califano,* 637 F.2d 968, 972 (3d Cir. 1981); *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an ALJ must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999), *relying on Dobrowolsky.*

Where a medical impairment that could reasonably cause the alleged symptoms exists, the ALJ must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work.  This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.  *See* 20 C.F.R. § 404.1529(c).  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). If an ALJ concludes that the claimant's testimony is not credible, the

28

specific basis for such a conclusion must be indicated in his or her decision.  *See Cotter*, 642

F.2d at 705. The Court of Appeals has stated:  "in all cases in which pain or other symptoms are

alleged, the determination or decision rationale must contain a thorough discussion and analysis

of the objective medical and the other evidence, including the individual's complaints of pain or

other symptoms and the adjudicator's personal observations.  The rationale must include a

resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation

of the individual's ability to work." *Schaudeck*, 181 F.3d at 433.

> With respect to Plaintiff's complaints of pain, the ALJ stated as follows:

> > Furthermore, the fact that the claimant might experience pain and
> > discomfort on the job does not compel a finding of disability. The
> > undersigned Administrative Law Judge finds that claimant's
> > statements concerning his pain, anxiety, and depression and their
> > impact on his ability to perform activities of daily living and to
> > work are considerably more limited and restricted than is
> > established by the medical evidence, his own contemporaneous
> > statements to treating sources, and medical source opinions. The
> > Administrative Law Judge is of the opinion that the discomfort
> > suffered by the claimant is not of the duration, frequency, or
> > intensity to be totally disabling or preclude a light level of
> > exertion with the additional limitations as defined.

(R. 22). The ALJ relied on Plaintiff's normal objective testing, the findings that Plaintiff had

only mild inflammatory bowel syndrome and mild colitis, lack of symptoms of pain in a

significant number Dr. Chandra's records, a normal ultrasound amidst complaints of pain, and

Plaintiff's reported ability to work on guns, fix motorcycles, ride motorcycles, and play Play

Station as evidence undermining his complaints of significant pain in the abdomen and elsewhere. (R. 21-26, 194-195, 204, 206, 208, 350-395, 441).[8]

The ALJ's conclusions include a seven page analysis of the medical and testimonial evidence and are well-supported by the record.  As a result, the ALJ's determination that Plaintiff's claims of disabling pain were not entirely credible are supported by substantial evidence.

### E.    Residual Functional Capacity Determination and Hypothetical Question

Next, Plaintiff argues that the ALJ improperly determined Plaintiff's residual functional capacity which led to an incomplete hypothetical being presented to the vocational expert. Plaintiff suggests that the report of Dr. Fackler indicating that Plaintiff could only stand and walk for a total of two hours per day and was required to take rests was not taken into account when formulating the residual functional capacity. (Pl.'s Brief at 9-10). He further argues that the ALJ failed to take into account Plaintiff's psychological limitations including his "'marked' impairment in his ability to deal with supervisors, deal with co-workers, deal with work pressures, and changes in the routine at work." *Id*.

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1

---

[8]  Plaintiff makes reference to one statement by the ALJ discussing a life insurance policy application in which Plaintiff purportedly indicated he was suffering from no major ailments. Although this Court found reference to the application there is no record of the contents of that application. This error on the part of the ALJ is harmless as he stated sufficient other support for his conclusions.

(3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations.  *See Cooper v. Barnhart*, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)).  In determining a person's RFC, an administrative law judge must consider all evidence of record. 20 C.F.R. § 416.920.  Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so.  *Id.*  As the court stated in *Burnett*, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"  *Id.* at 121 (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)).

The ALJ did not err in his assessment of Plaintiff's residual functional capacity. As noted in the discussion above, the weight given to the report of Dr. Fackler was well supported in the record. In fact, although Plaintiff was noted as being capable of light work, the ALJ modified that statement by giving Plaintiff a sit/stand option to accommodate his stated inability to stand for long periods of time. (R. 20). He further placed environmental restrictions to deal with Plaintiff's allergy, asthma, and sinus ailments. *Id.* Plaintiff again makes arguments regarding Dr. Altman and Goreczny's opinions regarding marked psychological limitations. As noted above, the ALJ gave the appropriate weight and analysis to these opinions and was therefore warranted in not accepting them and in not including them in Plaintiff's residual functional capacity.

Plaintiff also discusses his need for rests, defined in the hearing testimony as his repeated need to use the bathroom about four times per day. (R. 435, 438). In January 2001, Dr. Chandra reported that Plaintiff was having zero to one bowel movement a day. (R. 208). Dr.

Chandra's record from April 2004 indicates Plaintiff was "able to go to school and function normally. (R. 204). In June 2001, Plaintiff was experiencing only occasional diarrhea and normal bowel movements were noted in August. (R. 200-203). Although Plaintiff reported problems with diarrhea starting in September 2001, testing indicated only flares of his acid reflux and "some mild microscopic colitis." (R. 195). Notes from August 22, 2002 indicate a resolution of symptoms that continued through January of 2005 when incidences of acid reflux were again noted. (R. 176-179, 180-185, 186-189). Acid reflux was Plaintiff's main complaint following that visit. In July 2005, Dr. Chandra noted that Plaintiff was having bowel movements one time a day. (R. 170). There were no further reports of diarrhea to Dr. Chandra.

Considering the evidence of record and the findings of the ALJ, Plaintiff's residual functional capacity was supported by substantial evidence. In turn, the hypothetical question posed to the vocational expert was appropriately inclusive of Plaintiff's well-supported limitations and required nothing more.

### F.     Listing 12.04

Finally, Plaintiff argues that he clearly met the requirements of Listing 12.04 for Affective Disorders. Plaintiff again relies on the report of Dr. Altman and Dr. Goreczny. Listing 12.04 consists of paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations) and paragraph C criteria (a set of additional functional limitations). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 (A).  The required level of severity for 12.04 affective disorders is met when "the requirements in both A and B are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. In the instant case, the ALJ determined

that Plaintiff did not meet the B criteria of the Listing. (R. 15). The paragraph B requirements of Listing 12.04 require at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration[.]

20 C.F.R. Pt. 404, Subpt. P. App. 1 § 12.04(B). The term "marked" means "more than moderate but less than extreme," and a "marked limitation" is one that seriously interferes with the claimant's ability to "function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1 § 12.00C.

As noted above, the ALJ did not accept the conclusions of Dr. Altman that Plaintiff was suffering from marked limitations in each of the B categories. None of Dr. Altman's records clearly outline Plaintiff's depression symptoms or the severity of those symptoms. (R. 350-395). There is no evidence of mental status examinations performed by Dr. Altman. In addition, Dr. Goreczny diagnosed Plaintiff with moderate major depressive disorder and noted a GAF of 60 indicating moderate symptoms. (R. 316). This is not indicative of an individual who would meet several of the B categories. Dr. Glover also noted no marked limitations in any category. (R. 337). As discussed, Plaintiff was capable of performing well when he was doing something that he enjoyed like working on guns or riding and fixing motorcycles. (R. 358, 364, 371, 379, 381, 383, 385, 441). In conclusion, the ALJ did not err in determining that Plaintiff

did not meet the requisite two of four categories of the B criteria, and therefore did not err in finding he did not meet Listing 12.04.

**VI.      CONCLUSION**

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. No. 10) is denied and Defendant's motion for summary judgment (Doc. No. 14) is granted.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|                                       |     |               |
|---------------------------------------|-----|---------------|
| BRAD A. NICHOLS,                      | )   |               |
|                                       | )   |               |
|                       Plaintiff,      | )   | 2:09-cv-0839  |
|          v.                           | )   |               |
|                                       | )   |               |
| MICHAEL J. ASTRUE, COMMISSIONER       | )   |               |
| OF SOCIAL SECURITY,                   | )   |               |
|                                       | )   |               |
|                       Defendant.      | )   |               |


**ORDER OF COURT**

   **AND NOW**, this 21st day of January, 2010, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

   1.      Defendant's Motion for Summary Judgment (Document No. 14) is **Granted.**

   2.      Plaintiff's Motion for Summary Judgment (Document No. 10) is **Denied.**

   3.      An appropriate Judgment will follow.


                              BY THE COURT:


                              s/Nora Barry Fischer
                              United States District  Court Judge


cc:      Christine M. Nebel, Esquire
         Email: cnebel222@aol.com

         Christy Wiegand, Esquire
         Email:christy.wiegand@usdoj.gov